# Exhibit A

26CV038244-590

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV_______________

KRISTIN MILLS, PERSONAL REPRESENTATIVE OF THE ESTATE OF JAMES PATRICK MILLS, On Behalf of the Estate and His Survivors,

Plaintiff,

v.

GAUTAM SAVLA a/k/a Mian Qamar a/k/a Gary Patel; SONIA SAVLA a/k/a SONIA THAKER; NAJIYA CRANMER; HIGH LIFE ENTERPRISES INC., a North Carolina Corporation; HIGH LIFE ENTERPRISES, INC., a South Carolina Corporation; HIGH LIFE MANAGEMENT, LLC, a North Carolina Limited Liability Company; GIS ENTERPRISES INC, a North Carolina Corporation; RAAISHA ENTERPRISES, INC., a North Carolina Corporation; VST ENTERPRISES LLC d/b/a Vapor Smoke Shop, a North Carolina Limited Liability Company; SUHAIL THAKER; VAIDEHI THAKER; Hydroxie LLC, a California Limited Liability Company; TIMOTHY SHAW; ADAM ISRAEL; THANG BOTANICALS Inc. d/b/a 7ΩHMZ, d/b/a 7-OHMZ, d/b/a 7OHMZ, a Delaware Corporation; MITCHELL HAYWOOD; CECIL PAGE; JOSEPH MERINO; and GREGORY DALLI,

Defendants.

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

**NOW COMES** Plaintiff, Kristin Mills, Personal Representative for the Estate of James Patrick Mills ("Pat Mills"), by and through undersigned counsel, complaining of Defendants, and says and alleges the following:

1. This is a wrongful death lawsuit that arises from the death of Pat Mills due to acute mitragynine ("Kratom" or "MG") and 7-hydroxymitragynine ("7-OH") intoxication on July 11, 2024.

2. Kratom in its natural state is a dried leaf that is converted to a loose powder, packaged into capsules, or made into an extract, and frequently marketed as an analgesic. However, what Defendants fail to disclose in their packaging or otherwise is that one of the trace ingredients in kratom, 7-OH, works on the exact same opioid receptors in the human brain as morphine and its analogs, has similar effects, and has the same risks of physical addiction and dependency, with similar withdrawal symptoms.

3. Defendants in this action, knowing that kratom even in its natural state is perniciously addictive, preyed on unsuspecting consumers like Pat Mills by manufacturing, marketing, and selling tablets containing almost pure 7-OH—the extremely addictive and often deadly active ingredient that occurs in only trace amounts in natural kratom. While manufacturing and selling a product that creates addiction and withdrawal symptoms after only a few doses, Defendants intentionally and negligently failed to disclose such material facts anywhere on their labeling, packaging, or marketing materials. Indeed, the Defendants rely on their products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping hugeprofits along the way.

4. Reasonable consumers like Pat Mills do not expect the 7-OH tablets, which are marketed as a natural analgesic, to contain a product with the same

addictive potential of morphine and its analogs. Defendants relied on this ignorance and did nothing to correct it. In fact the calculated business model of the defendants is to rely on the addictive characteristics of 7-OH to ensure a steady supply of needy customers. Indeed, despite actual or constructive knowledge of the addictive propensities and life-threatening dangers of 7-OH and Pat Mills's addiction to it, they sold Mr. Mills tens of thousands of dollars of the drug until he overdosed on it and died.

## I. THE PARTIES.

5. Plaintiff is a citizen and resident of Lancaster County, South Carolina, and is the Personal Representative for the Estate of James Patrick Mills. As such, she claims damages for the death and suffering of Pat Mills on behalf of herself, their son Brody Mills, and Elijah Ball, Pat Mills' other son.

### The Selling Defendants

6. Defendant Gautam Savla a/k/a Mian Qamar a/k/a Gary Patel, upon information and belief, is a citizen of India, a resident alien of the United States, and a resident of Mecklenburg County, North Carolina.

7. Defendant Sonia Savla, upon information and belief, is an adult citizen and resident of Mecklenburg County, North Carolina.

8. Najiya Cranmer, upon information and belief, is an adult citizen and resident of Mecklenburg County, North Carolina.

9. Defendant High Life Enterprises Inc. ("High Life NC"), upon information and belief, is a corporation organized and existing under the laws of the

State of North Carolina with a principal place of business in Mecklenburg County, North Carolina.

10. Defendant High Life Enterprises, Inc. ("High Life SC"), upon information and belief, is a corporation organized and existing under the laws of the State of South Carolina.

11. Defendant High Life Management, LLC ("High Life Management"), upon information and belief, is a limited liability company organized and existing under the laws of the State of North Carolina with a principal place of business in Mecklenburg County, North Carolina.

12. Defendant GIS Enterprises Inc. ("GIS Enterprises"), upon information and belief, is a corporation organized and existing under the laws of the State of North Carolina with a principal place of business in Mecklenburg County, North Carolina.

13. Raaisha Enterprises, Inc. ("Raaisha"), upon information and belief, is a corporation organized and existing under the laws of the State of North Carolina with a principal place of business in Mecklenburg County, North Carolina.

14. Upon information and belief, Defendant Sonia Savla holds nominal ownership of all or substantially all of the shares of High Life NC, High Life SC, High Life Management, GIS Enterprises, and Raaisha (the "High Life Entities").

15. Upon information and belief, Defendant Sonia Savla holds nominal ownership of all or substantially all of the shares of the High Life Entities out of concern for Gautam's immigration status.

16. Defendants Sonia Savla, Gautam Savla, Najiya Cranmer, and the High Life Entities should be treated as a single enterprise for purposes of this litigation because during relevant times, *inter alia*, they:

(a) Commingled their funds and other assets and failed to segregate funds among them;

(b) Treated each others' assets as their own;

(c) Shared a unity of interest and ownership that each of these Defendants acts merely as a shell of the enterprise as a whole;

(d) Failed adequately to capitalize the High Life Entities such that if only one entity were to be held liable for the actions of the whole it would be unable to compensate Plaintiff and others for their harms and thereby promote injustice, unfairness, and fraud.

17. Defendant Suhail Thaker, upon information and belief, is a resident of Mecklenburg County, North Carolina, and owns and operates smoke shops, including Vapor Smoke Shop located at 16646 Hawfield Way Drive #105, Charlotte, North Carolina.

18. Defendant Vaidehi Thaker, upon information and belief, is a resident of Mecklenburg County, North Carolina, and owns and operates smoke shops, including Vapor Smoke Shop located at 16646 Hawfield Way Drive #105, Charlotte, North Carolina .

19. Defendant VST Enterprises LLC is a dissolved North Carolina limited liability company that upon information and belief had during relevant times

operational control of the Vapor Smoke Shops at 16646 Hawfield Way Drive #105, Charlotte, North Carolina and 1627 Sardis Road North, Suite 4b, Charlotte, North Carolina.

20. VST Enterprises LLC, upon information and belief, was owned and operated by Suhail and Vaidehi Thaker.

21. Upon information and belief, Defendants Suhail Thaker and Vaidehi Thaker dissolved VST Enterprises LLC after transferring its assets to themselves in order to avoid the claims of potential creditors, including Plaintiff herein.

22. Defendants Suhail Thaker, Vaidehi Thaker, and VST Enterprise LLC (collectively, the "Vapor Shop Defendants") should be treated as a single enterprise for purposes of this litigation because during relevant times, *inter alia*, they:

(e) Commingled their funds and other assets and failed to segregate funds among them;

(f) Treated each others' assets as their own;

(g) Shared a unity of interest and ownership that each of these Defendants acts merely as a shell of the enterprise as a whole;

(h) Failed adequately to capitalize VST Enterprises LLC such that if only one entity were to be held liable for the actions of the whole it would be unable to compensate Plaintiff and others for their harms and thereby promote injustice, unfairness, and fraud.

## The Manufacturing Defendants

23. Defendant Thang Botanicals, Inc. d/b/a 7ΩHMZ, d/b/a 7-OHMZ, d/b/a 7OHMZ ("Thang Botanicals"), upon information and belief, is a Delaware corporation having a principal place of business in the State of California, and at all times relevant hereto doing business in the State of North Carolina.

24. Defendant Mitchell Haywood, upon information and belief, is a citizen and resident of the State of California.

25. Defendant Haywood, upon information and belief, at all times relevant hereto has served as Chief Executive Officer of Thang Botanicals, has an ownership interest in Thang Botanicals, and operates and controls Thang Botanicals.

26. Defendant Cecil Page, upon information and belief, is a citizen and resident of the State of California.

27. Defendant Page, upon information and belief, at all times relevant hereto has served as an officer of Thang Botanicals, has an ownership interest in Thang Botanicals, and operates and controls Thang Botanicals.

28. Defendant Gregory Dalli, upon information and belief, is a citizen and resident of the State of California.

29. Upon information and belief, Defendant Dalli, at all times relevant hereto, controlled, operated, and held an ownership interest in, and was the Chief Financial Officer of, Defendant Thang Botanicals.

30. Defendant Joseph Merino, upon information and belief, is a citizen and resident of the State of California.

31. Defendant Merino, upon information and belief, at all times relevant hereto has served as Secretary of Thang Botanicals, has an ownership interest in Thang Botanicals, and operates and controls Thang Botanicals.

32. Dalli, Haywood, Page, Merino, and Thang Pharmaceuticals (collectively, the "Thang Defendants") operate in furtherance of a single enterprise, and are so financially intertwined as to be considered one and the same entity for purposes of this lawsuit.

33. Defendant Hydroxie LLC ("Hydroxie"), upon information and belief, is a California limited liability company having a principal place of business in the State of California, and at all times relevant hereto doing business in the State of North Carolina.

34. Defendant Timothy Shaw, upon information and belief, is a citizen and resident of the State of California.

35. Defendant Shaw, upon information and belief, at all times relevant hereto has been a member-manager of Defendant Hydroxie, has an ownership interest in Hydroxie, and operates and controls Hydroxie.

36. Defendant Adam Israel, upon information and belief, is a citizen and resident of the State of California.

37. Defendant Israel, upon information and belief, at all times relevant hereto has been a member-manager of Defendant Hydroxie, has an ownership interest in Hydroxie, and operates and controls Hydroxie.

## II. PAT MILLS' DEATH.

38. On July 11, 2024, Pat Mills, age 36, died at home in Lancaster, South Carolina.

39. He leaves behind his wife, Kristin, and their child, Brody, and a son, Elijah Ball, who lives in Atlanta with his mother.

40. The night of his death, Kristin found Pat on the floor near the downstairs bathroom of their home. His face was blue and he was unresponsive. When the EMS crew arrived, they could not find a pulse. Despite heroic efforts to bring him back, Pat's heart never beat again. He was not revived by EMS or the doctors at the closest hospital, in Monroe, North Carolina.

41. Pat died of a massive overdose of Kratom and 7-OH that was sold to him at vape shops that the individual Defendants operated.

42. As his vital systems shut down before he died, Pat was in pain and suffered. A neighbor's doorbell camera recorded him driving erratically into his driveway on the evening of July 11, 2024, and he can be heard gagging and choking as he staggered out of his car and entered his garage.

43. The drugs that killed Pat were mitragynine and hydroxymitragynine, commonly referred to and marketed as Kratom and 7-OH or Hydroxy. They were sold as natural substances that are safe, help the consumer feel better, and which could even help the consumer overcome addiction. In fact, they are addictive and deadly.

35. In 2024, thinking they were safe, Pat began purchasing Kratom and 7-OH from the High Life Smoke shops and the Vapor Smoke Shop in Charlotte. Upon

information and belief, Pat was completely unaware of the dramatic difference in potency and addictive characteristics between kratom and 7-OH.

36. Pat was a recovering alcoholic, former collegiate football player and coach who consumed kratom products to help him deal with pain from old football injuries and deal with recovering from alcohol addiction. He believed, based on Defendants' marketing and representations, that the kratom he purchased was all natural, created a relaxing effect, was helpful in overcoming his alcohol addiction, and was perfectly safe.

37. The High Life stores were operated by Defendants Gautam Salva, Sonia Savla, and Najiya Cranmer.

38. The High Life Smoke shops sold Pat 7-OH labeled 7OHMZ, which was manufactured and distributed by Defendant Thang Botanicals, Inc.

39. The Vapor Smoke Shop sold Pat a brand of 7-OH labeled Hydroxie, which was manufactured and distributed by Defendant Hydroxie.

40. Soon after he began taking the drugs, Pat became hopelessly addicted to the Kratom and 7-OH products, consuming greater amounts each month.

41. Pat suffered severe withdrawal symptoms such as night sweats and severe physical discomfort when he was not high on 7-OH, impelling him to purchase more and more.

42. The Defendants profited from Pat's addiction and happily sold him more and more of the drugs.

43. To meet the horrible demand of his addiction, in the 15 days before his death, Pat spent over $5,600 on 7-OH products: $3,055 at the Vapor Smoke Shop and $2,630 at the High Life Shops.

44. As part of his autopsy, the North Carolina Medical Examiner's Office conducted toxicology tests which revealed traces of lethal levels of mitragynine and the deadly additive 7-hydroxymitragynine (7-OH) in Pat Mills's blood system and listed the cause of his death as "acute mitragynine intoxication."

## III. KRATOM AND 7-OH

45. Kratom comes from the leaves of the Mitragyna speciosa tree that grows in Southeast Asia.

46. It is imported into the United States and is frequently marketed in this country as a safe supplement and wellness wonder.

47. Kratom and 7-OH are both marketed and sold as "kratom" by distributors and retailers; however, they are dramatically different products.

48. 7-OH is a psychoactive compound found naturally in minuscule amounts, typically less than 0.05% of the dried leaf mass, in the kratom plant. The 7-OH products Defendants sold Pat Mills contain concentrated 7-OH, are exponentially more potent than natural kratom, and can be as addictive as heroin.

49. The U.S. Food and Drug Administration (FDA) issued an import alert on kratom in 2012, which was additionally affirmed by import alerts in 2014 and 2016. As a result of these import alerts, the FDA seized more than 25,000 pounds of raw kratom, worth more than $5 million, in California during September 2014. In

January 2016, the FDA seized around 90,000 bottles of dietary supplements containing kratom in Illinois, and in August 2016, the FDA seized more than 100 cases of products containing kratom in California.

50. In about late 2016, the FDA announced a public health advisory on kratom, asserting that kratom was associated with 36 deaths and has similar effects to and dangers of opioids.

51. On February 6, 2018, the FDA issued a statement increasing the number of known kratom-associated deaths to 44. The FDA statement noted that it developed a new technology, called the Public Health Assessment via Structural Evaluation (PHASE) model, that could "simulate, using 3-D computer technology, how the chemical constituents of a substance are structured at a molecular level, how they may behave inside the body, and how they can potentially affect the brain." Based on the data obtained from the PHASE model, the FDA stated "[it felt] confident in calling [the] compounds found in kratom, opioids."

52. In April 2020 the US Department of Justice Drug Enforcement Administration published a drug "Fact Sheet" stating that consumption of "kratom" can lead to psychotic symptoms as well as psychological and physiological dependence. The publication states that kratom consumption can lead to, among other adverse effects, psychosis, hepatotoxicity (liver damage), seizure, and addiction.[1]

[1] Legislative Analysis and Public Policy Assn., "Regulation of Kratom in America." Available at https://legislativeanalysis.org/wp-content/uploads/2019/10/Kratom-Fact-Sheet-1.pdf.

53. The FDA warns that products, such as those at issue here, manufactured with "unnaturally high levels of 7-OH … pose[] a threat to public health that is more clearly understood based on the pharmacological properties and effects of 7-OH," in particular its "affinity for mu opioid receptors[2] and functional activity as an agonist at these receptors."

54. The FDA has further cautioned that "7-OH has consistently demonstrated an increased potency relative to morphine in preclinical rodent studies. These observations suggest 7-OH has pharmacological properties representative of a full mu opioid agonist and an associated high potential for abuse."

55. The FDA's warnings cite studies indicating that users of 7-OH may begin to suffer withdrawal symptoms within five days of escalating use, similar to morphine.

56. The FDA notes that "[a] major risk of opioid exposure and cause of opioid-induced death is respiratory depression" and finds that "7-OH may expose individuals to similar risks as classic opioids, including respiratory depression."[3]

57. The American Kratom Association (AKA) which lobbies for the kratom industry has widely published that the Association has developed a rigorous scientific

---

[2] The mu-opioid receptor is the same primary receptor with which heroin and oxycodone interact. It is known as "the gateway to addiction" because it is the receptor with which all opiates/opioids interact to produce the classic opiate high: euphoric, sedating, and analgesic. There are other opioid receptors, but the mu-opioid receptor produces the most "hedonic" or habit-forming effects such as euphoria and analgesia.

[3] FDA Center for Drug Evaluation and Research, "7-Hydroxymitragynine (7-OH): An Assessment of the Scientific Data and Toxicological Concerns Around an Emerging Opioid Threat." Available at https://www.fda.gov/files/drugs/published/7-hydroxymitragynin_7-oh_an_assessment_of_the_scientific_data_and_toxicological_concerns_around_an_emerging_opioid_threat.pdf.

understanding of kratom's natural alkaloid profile and the potential safety issues associated with artificially elevated levels of 7-OH. The Association has also widely published its stance that no kratom product should exceed naturally occurring levels of 7-OH and that any product violating these standards must be properly labeled as a non-kratom product. This standard prevents misleading consumers and ensures product transparency and safety.

58. The AKA further published an extraordinary warning advisory on its website on April 16, 2024, stating that "A 7-OH synthetically enhanced product is not a kratom product and consumers should not be deceived into thinking they are." The AKA went on to say in its advisory that it is standing on FDA policy that a synthetic copy of a botanical or constituent of a botanical do not meet the FDA's definition of a dietary ingredient and the consensus of leading scientists is that 7-OH enhanced products have a greater abuse liability and a higher risk for adverse events. "*There is currently no valid scientific literature that supports any claim that 7-OH is safe at artificially increased levels. To date, the AKA is not aware of any published literature documenting the safety profile of artificially isolated or concentrated 7-OH products, and leading kratom scientists recently issued a clear warning about isolated 7-OH products*."

59. Kratom has not been approved as medical treatment, food additive or as a dietary supplement.

60. The Defendants at all relevant times were well aware of the addictive and dangerous qualities of Kratom in its natural state.

61. For example, in an appearance on The Kratom Advocacy Podcast on or about September 9, 2024, Defendant Dalli (CFO of Defendant Thang Pharmaceuticals) stated that "7-Hydroxymitragynine focuses on the Mu opioid receptor which deals with pain relief, euphoria, focus, things like that.... 7-Hydroxymitragynine in specific is a really perfect key for the MU opioid receptor, and the reason why that is such an important thing is you don't need to take as much of it to get an effect versus if you look at morphine."[4]

62. Defendants nevertheless manufactured, marketed, and/or sold products that contained enormously high concentrations of 7-OH, knowing that, and, upon information and belief, intending that consumers would become addicted and purchase ever-increasing quantities of the products.

63. The Defendants did not warn Pat that the Kratom and 7-OH products were addictive.

64. The Defendants did not warn Pat that the Kratom and 7-OH products could kill him.

65. The Manufacturing Defendants intentionally created and used packaging that included ineffectual warnings so that consumers like Pat Mills would believe the Kratom and 7-OH were natural and safe.

66. The Selling Defendants knew that the packaging for the Kratom and 7-OH, including the ineffectual warnings on the packaging, created the false

[4] See https://www.youtube.com/watch?v=8lBSL_HTW4I, at 3 minutes and 10 seconds].

impression to consumers that the Kratom and 7-OH were natural and safe, knowing they were not.

67. The Defendants led Pat Mills to believe the Kratom and 7-OH were natural and safe.

68. When Pat Mills began using the Defendants' products, he used them as intended.

69. Soon after Pat began using the Defendants' products he became addicted to them and was unable reasonably to regulate his use of them, as Defendants knew was likely to happen and upon information and belief, as Defendants intended.

## V. ROLES AND PRACTICES OF THE DEFENDANTS.

### A. The High Life Entities.

68. At all times relevant to this complaint, the High Life Entities operated approximately twenty-six (26) smoke shops across North Carolina and South Carolina.

69. In 2012 Defendants Gautam and Sonia Savla were investigated and convicted of federal crimes relating to their illegal activities conducted out of their various High Life Smoke Shops. These activities involved manufacturing, packaging, distributing and selling illegal substances out of these shops.

70. Based on court filings by Sonia Savla, Gautam Savla, Najiya Cranmer, Limitless and the High Life Entities as well as the criminal indictments of Gautam and Sonia Savla these individuals and entities have been in the business of and selling Kratom products since at least 2012 and Gautam Savla as "product manager"

of the High Life Entities had a particular focus on Kratom products and envisioned this product as an important part of the High Life business strategy.

71. The legal ownership of the entities was placed in Sonia Savla's name because her husband, Gautam, had legal and immigration problems. However, Gautam and Najiya Cranmer were the individuals primarily in charge of the day-to-day operation of the smoke shops.

72. Upon information and belief, despite Sonia Savla's nominal ownership of the High Life Entities, Defendants Gautam Savla and Najiya Cranmer, upon information and belief, shared in profits generated by the companies and were *de facto* owners of the High Life Entities.

73. Two lawsuits have been filed between the Savlas in Mecklenburg County that describe the structure and operation of these defendants' enterprise, including *Sonia Savla, et al. v. Gautam Savla, et al.,* 25CV062244-590, and *Gautam Jitendra Savla v. Sonia Gautam Savla, et al.*, 25CV064102-590 ("Defendants' litigation"). Additionally, Sonia Savla has filed an alienation of affections suit against Najiya Cranmer in Mecklenburg County captioned *Savla v. Cranmer*, 25CV062832-590.

74. From these Defendants' litigation, it is apparent that the Savlas treated the High Life Entities as their alter egos, ignored corporate formalities, defrauded each other and the corporations, co-mingled funds and treated the corporations as their personal bank accounts.

75. Upon information and belief, based on verified pleadings in these Defendants' litigation, Defendants Gautam Savla and Najiya Cranmer embezzled and/or fraudulently transferred, disposed of or secreted over $10,000,000 from the High Life Entities to themselves and related companies.

76. Upon information and belief, based on verified pleadings in these Defendants' litigation, Defendant Sonia Savla wrongfully took over $5,000,000 from the High Life Entities for herself, is using the High Life Entities as a sword in the Savlas' bitter divorce, and is recklessly spending and wasting corporate assets for her personal satisfaction.

77. In 2025, Defendant Gautam Savla created a company named Limitless Distribution, LLC, which was set up to acquire and distribute smoke shop products, including dangerous products containing 7-OH to the various High Life Entities as well as other smoke shop business level customers.

78. On information and belief, these Defendants have made millions in proceeds from the High Life Entities with substantial profits coming from the sale of Kratom products.

79. Defendants Gautam Savla, Sonia Savla, Cranmer, and the High Life Entities have had at all times relevant hereto full knowledge of Kratom products and the highly addictive nature of 7-OH.

80. At all times relevant hereto Defendants Gautam Savla, Sonia Savla, Cranmer, and the High Life Entities have known or in the exercise of reasonable diligence should have known that the 7-OH products they sold, including the 7-OH

products they sold to Pat Mills, were marketed as "kratom," despite the dramatically different levels of potency and addictive potential of 7-OH compared to MG.

81. Purchasing a kratom product at the High Life Entities' shops is a highly personal, face-to-face experience with sales staff who inquire as to the customer's goal in purchasing and ingesting the kratom product they are purchasing and making customized recommendations based on the customer's response.

82. The sales representative scans the purchaser's driver's license when ringing up the purchase. On information and belief, the sale information and DL information is stored electronically.

83. The 7-OH that the High Life Entities sold to Pat Mills contained levels of 7-OH much stronger than the amount present in Kratom, and, upon information and belief, was many orders of magnitude stronger.

84. The product Pat Mills purchased between about April 2024 and July 11, 2024, was in a light green package labeled at the top "ADVANCED KRATOM ALKALOIDS" and "7-Hydroxymitragynine." The front of the packaging lists the ingredients as "Mitragyna speciosa (Kratom) leaf extract." The dosage was listed as "6 servings:<14mg per tablet (3ct)."

85. An example of the packaging for the *7OHMZ* products purchased by Pat Mills from the High Life Smoke Shop is shown here:







86. The back of the packaging states the following in block letters: "PRODUCT CONTAINS NATURALLY OCCURRING PLANT COMPOUNDS FROM MITRAGYNA SPECIOSA" followed by directions and a generic disclaimer, both in smaller print.

87. The packaging is misleading in that it describes the 7-OH as "*Naturally Occurring Plant Compounds*" without stating that the tablets contained greatly enhanced levels and concentrations of 7-OH and that 7-OH is a highly addictive compound which mimics an opioid.

B. Vapor Shop Defendants.

88. The Vapor Shop Defendants, upon information and belief, during relevant times owned and operated the Vapor Smoke Shop located at 16646 Hawfield

Way Drive #105, Charlotte, North Carolina, and made the decisions to market Hydroxie and 7-OH products to their customers, including Pat Mills.

89. The Thakers personally directed and controlled and authorized the actions of VST and the Vapor Smoke Shop in marketing and selling Kratom and 7-OH to Pat Mills.

90. Upon information and belief, VST was the alter ego of the Thakers.

91. Upon information and belief, VST was part of the Thakers' scheme and enterprise to market Kratom and 7-OH and they were in a conspiracy with one another.

92. The Vapor Shop Defendants had at all times relevant hereto full knowledge of Kratom products and the highly addictive nature of 7-OH.

93. At all times relevant hereto the Vapor Shop Defendants knew that the 7-OH products they sold, including the 7-OH products they sold to Pat Mills, were marketed as "kratom", despite the dramatically different levels of potency and addictive potential of 7-OH compared to MG.

94. Purchasing a kratom product at the Vapor Shop Defendants' shops is also a highly personal, face-to-face experience with sales staff who inquire as to the customer's goal in purchasing and ingesting the kratom product they are purchasing and making customized recommendations based on the customer's response.

95. On information and belief Suhail Thaker often worked in the two Charlotte Vapor shops servicing customers and ringing up sales.

96. The sales representative scans the purchaser's driver's license when ringing up the purchase. On information and belief, the sale information and DL information is stored electronically.

97. The 7-OH that the Vapor Shop Defendants sold to Pat Mills contained levels of 7-OH much stronger than the amount present in Kratom, upon information and belief, many orders of magnitude stronger.

98. The Vapor Shop Defendants knew or in the exercise of reasonable diligence should have known that Hydroxie was addictive and dangerous when his shop sold it to Pat Mills.

99. An example of the packaging for the Hydroxie products purchased by Pat Mills from the Vapor Shops is shown here:






100. The Vapor Shop Defendants are liable for their employees' actions in selling 7-OH products to Pat Mills pursuant to the doctrine of Respondeat Superior.

**C. Thang Botanicals Defendants**

101. Upon information and belief, Defendant Thang Botanicals is an undercapitalized alter ego of Defendants Haywood, Page, Merino, and Dalli.

102. The Thang Defendants conspired to sell and distribute 7-OH when they knew it was a dangerous product.

103. The Thang Defendants marketed, distributed, and sold their 7-OHMZ products containing highly concentrated 7-OH into North Carolina and across the United States knowing people like Pat would buy it.

104. 7-OHMZ branded products are sold nationally on the world-wide web at the address www.7OHMZ.com.

105. Thang Botanicals was established in order to shield these defendants from responsibility and liability for the carnage they caused by selling 7-OH.

106. As part of their scheme, the Thang Defendants developed and patented a method for converting mitragynine into a synthetic version of 7-OH. Patent No: US 12,466,830 B1.

107. Upon information and belief, the processes described in the Thang Defendants' patent were used to manufacture the 7-OH that Pat Mills purchased from the Selling Defendants.

108. The Thang Defendants' recipe for 7-OH in their patent included the addition of various "potentiator[s]" to "enhance [the] analgesic efficacy of the compound."

109. These potentiators magnified the effects of the 7-OH.

110. These potentiators included agmatine, liposomal vitamin C, tyramine, octopamine, dopamine, norepinephrine, a CYP450 inhibitor, ketoconazole, erythromycin, an NMDA receptor agonist, a GABA agonist, a muscle relaxant, and an antidepressant.

111. Some of these potentiators also minimized the body's resistance to the 7-OH and its natural ability to break it down and eliminate it.

112. The Thang Defendants knew their 7-OH products were addictive.

113. The Thang Defendants knew their products posed a health risk.

114. The Thang Defendants wanted people like Pat Mills to crave their 7-OH products.

115. The Thang Defendants' packages of 7-OH sold to Pat Mills failed to disclose any of the additives, that 7-OH was not Kratom, or that it was addictive and hazardous to his health.

**D. Hydroxie Defendants.**

116. Hydroxie is an undercapitalized alter ego of Defendants Timothy Shaw and Adam Israel.

117. These Defendants (collectively the "Hydroxie Defendants" conspired to sell and distribute 7-OH when they knew it was a dangerous product.

118. The Hydroxie Defendants sold their 7-OH into North Carolina knowing people like Pat Mills would buy it.

119. Hydroxie was established to shield these Defendants from responsibility and liability for the carnage they caused by selling 7-OH.

120. The Hydroxie Defendants knew of the enhanced effect of their 7-OH product and its dangers when they sold it into North Carolina.

121. One version of the Hydroxie website is attached as **Exhibit 1**. In it these defendants describe their process, including their "chromatographic separation process" and "advanced crystallization techniques."

122. The Hydroxie website states: *The importance of achieving 99% purity cannot be overstated. This exceptional level of refinement translates directly into the user experience, providing precise, measured effects that remain consistent with every use. Our advanced purification process ensures optimal absorption and reliable storage stability, delivering a clean clear experience every time.*

123. The Hydroxie Defendants' deliberate effort to entice people to use their 7-OH product and become addicted to it is illustrated by the fact that the Hydroxie website offered interested consumers a free sample of the drug.

**E. Defendants' Breaches of Duty to Pat Mills.**

124. As sellers of Kratom products, Defendants had a duty to know the highly addictive and harmful nature of the 7-OH products and refuse to sell these highly addictive 7-OH products containing lethal quantities of 7-OH to Pat Mills knowing that the 7-OH chemical compound was highly addictive and lethal in large doses.

125. The Defendants had a duty to reasonably investigate and inspect their Kratom, MG and 7-OH products before selling them to ensure they were safe for human consumption.

126. Defendants had a duty to ensure that their products contained conspicuous and adequate warnings as to the highly addictive and dangerous qualities of the products.

127. Defendants had a duty to ensure that their products were not adulterated or misbranded, and a duty to ensure their products did not contain false representations of material facts or concealed the highly addictive and potentially lethal nature of the 7-OH compound.

128. The Selling Defendants had a duty to train and educate their employees to prevent persons who purchased Kratom and 7-OH products and establish clear policies as to the inherent dangers of addiction to 7-OH and the high potential for fatal overdoses when ingested in frequent and large dosages.

129. The Selling Defendants had a duty to train and educate their employees and to establish policy not to sell 7-OH products to customers who were purchasing conspicuously large amounts of the products or who otherwise were/are observably addicted.

130. Defendants breached all of the above duties.

131. When Defendants and/or their agents sold their Kratom products to Pat Mills, Defendants knew or should have known that their Kratom products were not FDA approved and were unreasonably dangerous for human consumption.

132. The Selling Defendants knew or reasonably should have known that Mills was hopelessly addicted to the 7-OH based on his escalating and frequent in-person purchases of large and lethal quantities of 7-OH tablets.

133. Defendants were thoroughly knowledgeable about the nature of Kratom products. They knew or should have known of the dangers of 7-OH addiction which were readily available from the full body of published medical literature, government regulatory agencies such as the FDA and FTC, the American Kratom Association, and law enforcement agencies such as the DEA, as well as well-publicized lawsuits.

134. The death of James Patrick Mills was proximately caused by Defendants.

135. Defendants knowingly, wantonly and with reckless disregard for the life James Patrick Mills manufactured, marketed, and/or sold the addictive and harmful chemical compound 7-OH infused tablets to Mills.

136. Defendants' actions showed willful misconduct, malice, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

137. Upon information and belief, officers, directors, and/or managers of the corporate Defendants participated in and/or condoned the individual Defendants' willful and wanton conduct.

## IV. FIRST CAUSE OF ACTION PERSONAL INJURY AND WRONGFUL DEATH

138. All paragraphs of the Complaint are incorporated herein by reference and are pled in support of this and all other causes of action.

139. Defendants are liable to Plaintiff for the injury and wrongful death of Pat Mills, along with his reasonable funeral expense, pursuant to S.C. Code Ann. §§ 15-51-10, 15-5-90, 15-5-100, and other applicable law.

140. Alternatively, if North Carolina law applies, Defendants are liable for the injury and wrongful death of Pat Mills, along with his reasonable funeral expense, pursuant to N.C. Gen. Stat. § 28A-18-2 and other applicable law.

## V. SECOND CAUSE OF ACTION NEGLIGENCE, GROSS NEGLIGENCE AND WILLFUL AND WANTON ACTION

141. All paragraphs of the Complaint are incorporated herein by reference and are pled in support of this and all other causes of action.

142. Defendants and their agents breached their duties of care in selling Kratom products in one or more ways including:

a. Defendants and their agents knew of or should have known of the potential of the Kratom and 7-OH products that Pat Mills purchased to cause serious side effects, including tolerance, addiction, overdose, and death.

b. Defendants and their agents failed adequately to warn consumers of their Kratom and 7-OH products including Pat Mills of the addictive and dangerous characteristics of the products.

c. Defendants and their agents manufactured, marketed, and sold Kratom and 7-OH products to consumers including Pat Mills even though the unreasonable health risks of such use were not properly understood, identified, disclosed, approved, or regulated.

d. Defendants and their agents knew or should have known that their disclaimers were a sham attempt to avoid responsibility for Kratom products that were not safe for human consumption. Despite known hazards and regulatory warnings, the Defendants continued to market and sell Kratom and 7-OH products in North Carolina containing enhanced concentrations of synthetic alkaloids putting countless North Carolinians, including Pat Mills, at risk.

e. Defendants and their agents negligently passed on to consumers, representations about the Kratom products, including representations that the Kratom was safe, pure, and appropriate for pain relief and to kick other addictions.

f. The Selling Defendants continued to sell Pat Mills Kratom and 7-OH products after they knew or should have known he was addicted to them and that as a result his health was in grave peril.

g. The Selling Defendants failed to train their employees adequately to warn consumers, including Pat Mills, of the addictive and dangerous nature of the Kratom and 7-OH products they sold him.

143. Defendants' and their agents' gross negligence and reckless, wanton conduct was a substantial contributing factor and proximate cause of James Patrick Mills death.

144. The grossly negligent acts of the Defendants and their agents jointly and severally would have entitled the decedent to recover damages if death had not ensued.

## VI. THIRD CAUSE OF ACTION – FRAUD

145. All paragraphs of the Complaint are incorporated herein by reference and are pled in support of this and all other causes of action.

146. Defendants falsely represented the contents and the effect of their 7-OH products and failed to inform Pat Mills of their dangers.

147. Defendants intended for Pat Mills to rely on their representations and omissions.

148. Pat Mills reasonably relied on Defendants' representations and omissions in purchasing the Defendants' 7-OH products.

149. As a result of that reliance, Pat Mills became addicted, was injured and died.

## VII. FOURTH CAUSE OF ACTION – PRODUCT LIABILITY

150. All paragraphs of the Complaint are incorporated herein by reference and are pled in support of this and all other causes of action.

151. Defendants developed, manufactured, distributed, and/or sold the Kratom and 7-OH products that injured and Pat Mills and caused his death, which products were inherently dangerous and defective, lacked sufficient instructions on proper usage, and were improperly manufactured.

152. Pat Mills used the Defendants' products in an ordinary, foreseeable, and, until he became hopelessly addicted to the products, reasonable manner.

153. The injuries and death to Pat Mills caused by Defendants' products was reasonably foreseeable.

154. The Kratom and 7-OH products that injured and Pat Mills and caused his death had potential risks that were known or reasonably knowable to Defendants.

155. These potential risks presented a substantial danger when the products were used or misused in an intended or reasonably foreseeable way.

156. Ordinary consumers like Pat Mills were not likely to have recognized those potential risks.

157. The Defendants failed to adequately warn or instruct Pat Mills as to the potential risks of their products.

158. The lack of sufficient warnings or instructions was a proximate cause of and a substantial factor as to Pat Mills' injuries.

159. Adequate and conspicuous warnings from Defendants on the products' packaging and/or in direct communications with Pat Mills would have prevented his injuries and death.

160. Defendants at all relevant times were engaged in commercial transactions related to the products that injured Pat Mills and caused his death and were in the business of doing so.

161. Defendants are liable to Plaintiff for the injury and death of Pat Mills pursuant to S.C. Code Ann. § 15-73-10 and other applicable law due to the dangerous and defective condition of the 7-OH they sold him and the failure to warn him of its dangerous condition.

162. In the alternative, to the extent California law applies, Defendants are liable to Plaintiff for the injury and death of Pat Mills under California common law and/or other applicable law due to the dangerous and defective condition of the 7-OH they sold him and the failure to warn him of its dangerous condition.

163. In the alternative, if North Carolina law applies, Plaintiff alleges that under N.C. Gen. Stat. § 99B, and other applicable law, Defendants are liable for misleading Pat Mills about the dangerous condition and for the dangerous condition of the 7-OH they sold him.

164. Defendants are jointly and severally liable for this Cause of Action.

**WHEREFORE**, Plaintiff respectfully prays that the Court grant the following relief:

1. That Plaintiff be granted judgment in Plaintiff's favor against the Defendants jointly and severally on all the respective counts against them in an amount to be proven at trial.

2. That Plaintiff have and recover of Defendants, jointly and severally, on each of the respective causes of action against them, compensatory damages in excess of $25,000 plus interest at the highest rate allowed by law together with the costs of this proceeding.

3. That Plaintiff have and recover of Defendants, jointly and severally, punitive damages in an amount in excess of $25,000 to be determined at trial.

4. That Plaintiff further recover from Defendants jointly and severally:

a. Expenses for care and treatment incident to the injury resulting in death;

b. Compensation for pain and suffering of James Patrick Mills;

c. The reasonable funeral expenses of James Patrick Mills;

d. The present monetary value of James Patrick Mills to Kristin Mills, Brody Mills and Elijah Ball, the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected income of James Patrick Mills; services, protection, care and assistance of James Patrick Mills; society, companionship, comfort,

guidance, kindly offices and advice of James Patrick Mills to Kristin Mills, Brody Mills, and Elijah Ball;

e. Nominal damages.

5. That the costs of this action, including Plaintiff's attorneys' fees, be taxed against the Defendants; and

6. That Plaintiff have and recover such other and further relief as the Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted, this the 10th day of October, 2018.

HIGGINS BENJAMIN, PLLC
301 North Elm Street, Ste. 800
Greensboro, NC 27401
Telephone: 336-273-1600
Facsimile: 336-274-4650

/s/ *Frederick L. Berry*
Frederick L. Berry (NC State Bar No. 9696)
fberry@greensborolaw.com
/s/ *John F. Bloss*
John F. Bloss (NC State Bar No. 23947)
jbloss@greensborolaw.com

CHRIS SWECKER LAW PLLC
1506 Hugh Forest Rd.
Charlotte, NC 28270.
Telephone 704-277-1024
Facisimile 704-321-9141

/s/ Chris Swecker
Chris Swecker (NC State Bar#10065)
chris.swecker@sweckerlaw.com

A beaker pouring into a test tube.

# How Our State-of-the-Art 7-OH Purification Process Revolutionizes 7-OH

MARCH 10, 2025

Share

The journey from botanical leaf to premium extract is one of precision, innovation, and unwavering commitment to quality. At Hydroxie, we've developed a revolutionary purification process that achieves something previously thought impossible: 7-OH extracts with greater than 99% purity. Here's an inside look at how we're setting new standards in botanical science.

## The Challenge of Extraction and the 7-OH Purification Process

Traditional extraction methods have long struggled with efficiency and consistency. Most processes yield varying levels of purity, leading to inconsistent results and unreliable experiences. Our team of laboratory scientists recognized this challenge and spent years developing a solution that would transform the industry.

Our proprietary process begins with carefully selected leaves from our trusted partners. The journey from raw material to final product involves three critical stages, each carefully optimized for maximum efficiency and purity.

The initial extraction phase employs advanced solvent selection specifically optimized for 7-OH isolation. Throughout this stage, our laboratory maintains precise

temperature control while continuously monitoring extraction efficiency. Multiple filtration stages ensure thorough initial purification before moving to the next phase. Next comes our innovative chromatographic separation process. Using state-of-the-art equipment and custom-designed separation protocols, we achieve unprecedented levels of refinement. Real-time purity monitoring allows our scientists to make precise adjustments, ensuring optimal results through multiple purification passes.

The final purification stage involves advanced crystallization techniques using ultra-pure solvent systems. Temperature-controlled environments and vacuum drying preserve the integrity of the final product, resulting in the exceptional purity levels that set our products apart.

## Laboratory Excellence in Action

Quality control is integrated into every step of our process. Beginning with comprehensive raw material analysis, we conduct continuous in-process testing during extraction to ensure we're maintaining optimal conditions. Each batch undergoes final product verification and stability monitoring, with additional third-party laboratory verification providing an extra layer of confidence in our results.

Our breakthrough came from understanding the molecular structure of 7-OH at a deeper level. Through extensive research and development, our laboratory team has perfected a process that maximizes extraction efficiency while minimizing degradation. This deep understanding ensures consistent results and maintains molecular stability throughout the extraction process.

The importance of achieving 99% purity cannot be overstated. This exceptional level of refinement translates directly into the user experience, providing precise, measured effects that remain consistent with every use. Our advanced purification process ensures optimal absorption and reliable storage stability, delivering a clean, clear experience every time.

## Quality Control and Verification

Our dedication to quality requires comprehensive testing at every stage. Each batch undergoes detailed HPLC analysis to verify purity levels and mass spectrometry to confirm compound identification. We conduct extensive stability testing under various conditions, while additional screening for microbial contamination and heavy metals ensures the absolute safety and purity of our products.

As we continue to refine our processes, we're already looking ahead to the next innovations in botanical science. Our laboratory team is constantly exploring new techniques, testing advanced equipment, and pushing the boundaries of what's possible in extract purification.

We believe that transparency in our processes helps build trust and understanding. While we maintain certain proprietary aspects of our methodology, we're proud to share the general principles that make our products superior. This commitment to openness, combined with our relentless pursuit of excellence, continues to drive innovation in our laboratory.

Try a free sample from Hydroxie today, explore our premium collection of laboratory-grade extracts and discover the difference in lab-grade purification.

This product is not intended to diagnose, treat, cure, or prevent any disease. You must be 21+ to purchase it. It is not available in all areas—check local regulations.

← Back to blog

***MUST BE 21+ TO PURCHASE***
***The statements made regarding these products have not been evaluated by the Food and Drug Administration. The efficacy of these products has not been confirmed by FDA-approved research. These products are not intended to diagnose, treat, cure or prevent any disease.***

***We do not ship to the following states, cities, and/or municipalities: Alabama, Arkansas, Indiana, Rhode Island, Vermont, Wisconsin, Sarasota County (FL), San Diego (CA), Oceanside (CA), Alton (IL), Jerseyville (IL), Edwardsville County (IL), Columbus (MS), Union County (MS), Ascension (LA), Franklin (LA), Rapides (LA)***

JOIN THE CLUB - Subscribe Now

Email →

© 2025, Hydroxie · Refund policy · Privacy policy · Terms of service · Shipping policy